of the counsel for plaintiff is like the court's. 1 Del.Laws 60 provided etc., "The Orphans' Court shall have due regard to all wills and testaments," etc. It does not appear E. Kirkpatrick ever was removed. For my part I never did see a clearer case come before a court and jury.

*Bayard* for plaintiff. It does not appear that E. Kirkpatrick ever appealed or objected to the appointment of I. Alexander. Vaugh. 181. Litt.Ten., s. 379, all offices of trust as steward, constable, must be personally occupied, unless granted to be occupied by a deputy.

The Court directed the jury that if they should find the fact to be that the widow, who was the testamentary guardian under the will, did relinquish, or consent to the appointment of Isaac Alexander, eleven years after the testator's death, in that case there will be no obstacle in the way of your finding for the plaintiff the sum which the evidence may convince you is due. It is a matter of doubt how far the bond may be binding after the minor came to the age of fourteen. The practice of the Orphans' Court formerly was to remove guardians either from incapacity or on application of the parties. Whether this was really the fact is for you to decide.

## CHARLES EVANS v. DAVID NEVIN and CHARLES ANDERSON.

Court of Common Pleas. New Castle. December 19, 1796.

*Rodney's Notes.*

*Vandyke, Bayard* [for plaintiff]. *George Read* [for defendants].

*Vandyke* read *narratio.* Rivulet in M. Creek and Christiana Hundred.

William Armor. I was present when Brindley was going to R. Clay Creek to level the waters. G. Evans and sons went with

us. We levelled the water along Evans' land, cannot tell how much of all they made, but it would have raised the ford to the saddle skirts of a common horse. It is now deeper than when levelled. I rather think the dam is higher than it was then. Evans has been in possession of the land on both sides thirty or forty years. There was a marked bush or tree where the water was to be raised to. Evans did not object ten, twelve or fifteen years ago. It was intended to raise the water as much as plaintiff's land would bear and to build a mill for each of three of his sons.

Peter Poulson, affirmed. I have lived forty-two years on the land. The water above the ford was dead. The ford used to be about knee deep. When the top log was put on they piled stone on it. It raised the water eighteen inches or two feet and drowned an acre of my meadow. We settled this with David Nevins and Charles Anderson. Six years ago they purchased; Anderson sold since to Faulk. Heard of no complaint until since the sale, not raised since.

John Stille. I was at the building of the dam. A number were present. It was measured and raised to the height agreed on. A log has been laid on since—I suppose a foot higher.

William Redeken. There is not an acre scarcely drowned on west side. The road by [the] mill is one-fourth mile farther than by [the] ford, and much worse.

John Evans. In the year 1782 I built a mill dam. I employed Mr. Brindley to level. I raised the dam so high that, laying a level on the top, it was thirteen and one-half feet above the foot of the race below. The depth of the race was to have been two and one-half feet or three feet. The dam was built twenty-five or thirty feet below an ash tree. The water is now higher than when the dam was built. The water would then flow over the dam before it would the banks of the race. It now is the contrary. I obtained an instrument from my father privileging us to begin the race in his land. He at length agreed to give us from under his hand but would not seal it. When the mill was sold, I returned it to my father. The water is low now, but at the ford four feet two and three-fourths. Oliver Evans and the defendants owned the mill after the sale. The agreement with my father was that we were not allowed to raise the water so as to spoil the ford. I have been told by Oliver Evans that he raised the dam while I was at sea.

William Dunn. I have seen the land near the creek. It was plowed and sowed in grass—about one and one-half acres of it—came near down to the mill dam, [and] was fenced.

Joseph Evans. My father took me with him to give Evans, Nevin, and Anderson notice not to rent without lowering the dam. They refused and threatened the old man.

T. Evans. We were to find out how much head and fall it would bear, so as not to injure the ford. I was present, heard O. Evans bid off the land etc. in 1791.

Moses McKnight. I assessed it, one year since the sale, as Oliver Evans'; since about four years ago I assessed it as Anderson's and Nevin's. Oliver Evans told me he owned one-third part of the mill.

*George Read* for defendants. May 25, 1792, deed from T. L. Kean, sheriff, to defendants for mill etc.

Joseph Robinson. The log was put on some time after the dam was built. The dam was about the height of the mark, I supposed.

Oliver Evans offered. David Nevin and Charles Anderson purchased of my brothers. In 1781 a contract was made by my father and brothers for the land and mill seat, and John began a dam but did not finish it. I undertook it. I was shown a mark about fifteen inches up a tree, which was said to be the height the dam was to be raised. My father gave me the tree and assisted to cart it and put it on the dam. I levelled and found fifteen feet and near sixteen feet fall. When John returned, he brought me the license and showed it; it was to heirs and assigns. After the sale my father complained the water was too high, but never before. I told him I had seen his license. In 1790 I left the neighborhood, and in separating the company and my private papers I found the grant for raising the water and delivered it afterwards to John. The amount of the judgments against us was £1750; about one-fourth of an acre drowned on the east and one-fortieth of an acre on the west. The dam was finished in 1784.

Richard Mahan. Twelve or thirteen years ago I was a witness to the license for taking the water by a race through a corner of his land. Plaintiff was a good deal unwilling to sign it. I was the only witness to it.

Stephen Faulk.

Esp.N.P. 704, 705. The witness is not admissible on the ground that he is the tenant and may be liable to a suit for the continuance of the nuisance if plaintiff should obtain a verdict in this case.

By consent of parties, this cause is left to the jury without argument on the Court's telling the jury that the law was [that]

76

if a nuisance was committed, every continuance was a new nuisance.

Verdict for defendants.

## STATE v. SAMUEL.

Court of Quarter Sessions.  New Castle.  December 19, 1796.

*Rodney's Notes.*

*Ridgely* [for plaintiff].  *Duff, Rodney* [for defendant].

Indictment for burglary.

The Court being doubtful of its having jurisdiction to try free Negroes for capital offences, the prisoner was remanded to prison.  The witnesses recognized to appear at the next Court of Oyer and Terminer, to which court the Attorney General removes this cause by *certiorari*.  By 1 Body Laws 94, Court of Oyer and Terminer only authorized to try capital offences.

## WILLIAM HARRISON [qui tam] v. ADAM HUNTER.

Court of Common Pleas.  Sussex.  May, 1797.

*Rodney's Notes.*\*

*Miller, Bayard* [for plaintiff].  *Wilson, Peery* [for defendant].

Simon Kollock sworn.  In 1790, July or August, Adam Hunter came to my house, to me.  He lived in New Castle, said he pur-

---

\* This case is also reported in *Wilson's Red Book, 160*.